UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>    v.<br><br>ROBERT HUCKABY, individually and in his capacity as the Trustee of Texas Tea Trust; GREGORY L. HUNT; and ACTION CONSTRUCTION CO.,<br><br>          Defendants. | No. 2:13-cv-02158-MCE-EFB<br><br>**MEMORANDUM AND ORDER** |
|---|---|

      This is a lawsuit instituted by the United States for payment of unpaid taxes by Defendant Action Construction Co., a Nevada corporation ("Action"). The suit arises from a payment of $83,069.61 made to settle a large receivable owed to Action on a construction project. Rather than remit the money to the United States for unpaid taxes, Defendant Robert Huckaby ("Huckaby"), an attorney who had represented both Action and its owner Defendant Gregory Hunt ("Hunt"), engineered a series of transactions that resulted in the funds being diverted and ultimately paid in large part to Defendant Hunt for his own personal use. The United States responded with the instant lawsuit, which charges Defendants in its First and Second Claims with violations of 26 U.S.C. § 6332(d) for failing to honor the government's levies on the proceeds in question and for doing so without reasonable cause. Additionally, by way of its Third and Fourth Claims, the

1

government asserts causes of action for fraudulent transfer and conversion.  Presently before the Court is the United States' motion for summary judgment as to each of those claims.  For the reasons set forth below, the government's motion is GRANTED in part and DENIED in part.[1]

## BACKGROUND

The facts here are basically undisputed.  Defendant Hunt formed Action along with a partner, Richard Gregg, in 1974.  Gregg ended his involvement with Action in approximately 2004, but Hunt continued to operate the company.  One of Action's last projects, the so-called Minden Gateway Center, went bankrupt in about 2009.  As a result of that insolvency, Action was paid only about $1.75 million of the $2.25 million contract price, a shortfall that made Action itself insolvent by the end of 2009.  Action sued for the additional monies it was owed around this time ("the Minden lawsuit") and, as a result of its financial distress, was unable to pay employment taxes among other tax obligations.  Action ultimately had to file for bankruptcy protection.

Hunt alleges that, by February 23, 2011, when Hunt received a settlement check for the Minden lawsuit made out to Action in the amount of $83,069.61, the assets of Action had already been disbursed to settle creditor's claims in the course of those bankruptcy proceedings and Action no longer continued to exist.  Hunt asked his attorney, Huckaby, what to do with the funds and Huckaby suggested they be deposited into Huckaby's client trust account.  On June 6, 2011, several months after making that deposit, Huckaby called Michael Franck, a revenue officer for the Internal Revenue Service ("IRS"), and informed Franck of the payment.  Franck demanded that the entire amount be handed over to the government for unpaid tax obligations, and Huckaby filed for personal bankruptcy on Hunt's behalf that same day.  Thereafter, on August 29,

---

[1] Having determined that oral argument would not be of material assistance, the Court ordered this matter submitted on the briefs in accordance with E.D. Local Rule 230(g).

2011, at Hunt's instruction, Huckaby transferred the money to an inactive trust called the Texas Tea Trust for which Huckaby was Trustee. Although Franck had previously demanded payment both verbally and by letter, he followed up those attempts on September 7, 2011, with two notices of levy directed to Huckaby, one to him personally and the other to him in his capacity as attorney in fact for Action. Both made claims totaling $88,890.05 in unpaid taxes, sums well in excess of the settlement funds that Action had received. Apparently on the basis of the above-described transfer, Huckaby responded to the levies by stating that there were "no funds" even though he was trustee of the Trust where the monies at issue had been placed.

To complicate matters further, on December 14, 2009, Hunt executed a promissory note in favor of Richard Gregg in the amount of $225,000.00 which represented Hunt's alleged "buyout" of Gregg's interest in Action despite the fact that Action was in fact insolvent by the time of that sales transaction. Then, after Action received the subject $83,069.61 settlement for the Minden lawsuit, Huckaby prepared a "Memorandum" on his own legal letterhead in which Gregg "demanded" that Hunt pay that entire amount to him in accordance with the 2009 promissory note and a UCC-1 security lien filed over a year later, on January 6, 2011.

Then, on November 16, 2011, Huckaby drafted a memorandum on his own letterhead signed by Richard Gregg. That memorandum demanded the $83.069.61 be paid to Gregg since Gregg had "sold" his remaining interest in the company, as indicated above, for $225,000.00. Citing the January 6, 2011, UCC-1 security lien, Gregg claimed he was entitled to those proceeds, and Huckaby proceeded to pay Gregg the entire $83,069.61 amount by way of a cashier's check on December 9, 2011.[2]

On February 16, 2012 Huckaby opened up yet another account, as trustee of the "Richard P. Gregg Trust," and deposited the December 9, 2011, cashier's check to

---

[2] While Huckaby claims there was nothing wrong with the fact that "secured creditor Richard Gregg got hold of the subject funds before the IRS did" (Defs.' Opp., 4:1-3), the IRS levies were in fact served on or about September 7, 2011, over two months before Huckaby transferred the funds to Gregg on December 9, 2011.

3

Gregg into that account. Huckaby then established a third trust vehicle, the New Horizons Trust, and Gregg authorized Huckaby to make payments for Hunt's benefit to that Trust. After paying part of the money ($20,537.53) to satisfy employment tax liabilities that were Hunt's personal responsibility, most of the funds (some $53,500.00) were paid to Hunt through the New Horizons Trust in order for Hunt to "start over."[3] As of June 15, 2015, however, the IRS had still not collected $35,719.36 in tax liabilities still owed by Action.

## STANDARD

The Federal Rules of Civil Procedure provide for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. Celotex, 477 U.S. at 325.

In a summary judgment motion, the moving party always bears the initial responsibility of informing the court of the basis for the motion and identifying the portions in the record "which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).

In attempting to establish the existence or non-existence of a genuine factual dispute, the party must support its assertion by "citing to particular parts of materials in

---

[3] Huckaby also paid himself $7,500.00 for legal fees he charged to represent Hunt in his personal bankruptcy proceedings. Therefore a total of $61,000 was paid out of the settlement proceeds for Hunt's own benefit.

4

1  the record, including depositions, documents, electronically stored information,
2  affidavits[,] or declarations . . . or other materials; or showing that the materials cited do
3  not establish the absence or presence of a genuine dispute, or that an adverse party
4  cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).  The
5  opposing party must demonstrate that the fact in contention is material, i.e., a fact that
6  might affect the outcome of the suit under the governing law.  Anderson v. Liberty Lobby,
7  Inc., 477 U.S. 242, 248, 251-52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and
8  Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987).  The opposing party must also
9  demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is
10 such that a reasonable jury could return a verdict for the nonmoving party."  Anderson,
11 477 U.S. at 248.  In other words, the judge needs to answer the preliminary question
12 before the evidence is left to the jury of "not whether there is literally no evidence, but
13 whether there is any upon which a jury could properly proceed to find a verdict for the
14 party producing it, upon whom the onus of proof is imposed."  Anderson, 477 U.S. at 251
15 (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)) (emphasis in original).
16 As the Supreme Court explained, "[w]hen the moving party has carried its burden under
17 Rule [56(a)], its opponent must do more than simply show that there is some
18 metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586.  Therefore,
19 "[w]here the record taken as a whole could not lead a rational trier of fact to find for the
20 nonmoving party, there is no 'genuine issue for trial.'"  Id. 87.

21     In resolving a summary judgment motion, the evidence of the opposing party is to
22 be believed, and all reasonable inferences that may be drawn from the facts placed
23 before the court must be drawn in favor of the opposing party.  Anderson, 477 U.S. at
24 255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's
25 obligation to produce a factual predicate from which the inference may be drawn.
26 Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd,
27 810 F.2d 898 (9th Cir. 1987).
28 ///

# ANALYSIS

### A.     Failure to Honor IRS Levies

Section 6331 of the Internal Revenue Code provides that if any person liable for any tax neglects or refuses to pay the tax within ten days following notice and demand, the IRS may proceed to collect the tax through levy upon all property or rights to property of the delinquent taxpayer.  26 U.S.C. § 6331(a).  The language employed by subdivision (b) of the statute, which extends to "all property possessed and obligations existing at the time of the levy" is broad and reflects congressional intent "to reach every interest in property that a taxpayer might have."  See United States v. National Bank of Commerce, 472 U.S. 713, 721 (1985).  Significantly for purposes of the present case, the IRS' reach in this regard extends beyond the taxpayer itself since any person in possession of property belonging to a delinquent taxpayer upon which a levy has been made must also, upon demand, surrender such property to the IRS.  26 U.S.C. § 6332(a).  A person who fails to comply with a Notice of Levy faces personal liability for such failure under § 6332(d)(1), as well as a penalty over and above the applicable amount in the amount of 50 percent unless reasonable cause for failure to honor the levy can be established.  Id. at § 6332(d)(2).

The defenses available to a party served with a valid notice of levy are limited, extending only to instances where the person does not possess the property or rights to the property, or where the property has already been subject to a prior attachment or execution.  U.S. v. Hemmen, 51 F.3d 883, 887-888 (9th Cir. 1995).  Questions as to the validity of the levy and competing claims to the ownership of the funds are not deemed to be valid reasons for refusing to honor a levy.  United States v. Daccarett, 6 F.3d 37, 59 (2d Cir. 1993).  Additionally, to the extent a defendant claims he or she did not have the rights to the property as of the time of the levy, they have the burden of proof to establish that lack of interest rests with them.  See Flores v. United States, 551 F.2d 1169, 1174 (9th Cir. 1977) ("[I]t seems appropriate for such a person (one sued for

failure to honor an IRS levy) to carry the burden of showing non-ownership by the taxpayer as a defense because the purpose of the statute is a coercive one which seeks to foster swift tender of property which has been levied upon.").

There is no question that Hunt received a check made payable to Action that was remitted to settle an outstanding receivable pertaining to one of Action's past construction projects. Nor is there any dispute that this remittance constituted an asset of the company.[4] Moreover, under Nevada law a corporation cannot make distributions to its owner or stockholders if such a distribution would prevent the corporation from being able to pay its own debts. Nev. Rev. Stat. § 78.288(2)(a). Because Action had outstanding tax liabilities which exceeded the amount of the check at the time it was received, it follows that those liabilities would have to be satisfied before Hunt could claim any interest in the funds.

As indicated above, Huckaby initially negotiated the check and deposited the funds into his client trust account before transferring those funds into another account he held as the Trustee of the Texas Tea Trust. As also set forth above, once the IRS issued notices of levy as to the proceeds, Huckaby initiated personal bankruptcy proceedings for his client, Mr. Hunt. Huckaby argues that by filing that action, any levy against Action was nullified because of the automatic stay attaching to bankruptcy proceedings. As the government points out, however, Hunt's own bankruptcy has no bearing on the failure to honor liens issued by the IRS, since Action was not a party to the bankruptcy and Hunt's bankruptcy estate had no legally cognizable interest in Action's property.[5]

---

[4] The Court recognizes Defendants' contention that because Action's corporate charter was suspended in August 31, 2010, it did not exist as a legal entity and consequently "any asset attributable to [the] company belonged to Gregory Hunt as its sole owner." Defs.' Opp., 2: 15-20. That argument, however, is plainly incorrect. The fact that Action may have ceased to do business did not mean its assets somehow belonged to Hunt. Under Nevada law, when "the charter of a corporation is revoked and the right to transact business is forfeited, all the property and assets of the defaulting domestic corporation must be held in trust . . . . " Nev. R. Stat. § 78.175(5).

[5] The fact that Hunt declared the Action settlement proceeds in his personal bankruptcy schedules is of no moment since those funds were Action's. This was explicitly recognized by Hunt's bankruptcy trustee, who characterized those monies in his final March 22, 2013 report as "belong[ing] to Action Construction Inc., not a party to [the bankruptcy]." See Pl.'s Undisputed Fact No. 31.

Nor can Huckaby profess confusion about competing claims to the funds in question as justifying his refusal to recognize the IRS's claim. See Daccarett, supra, 6 F.3d at 59. Therefore, Huckaby cannot claim that Richard Gregg's UCC-1 lien against Action, which purportedly secured Hunt's personal debt in buying Gregg's share of Action, was a valid factor in determining whether or not to honor the IRS levy.

Additionally, it was Huckaby who drafted the memorandum signed by Gregg in which Gregg demanded that the funds be paid to him. Huckaby then set up yet another account, the Richard P. Gregg Trust, and with Gregg's approval, began to shift funds to Hunt personally through the so-called "New Horizons Trust" in amounts that ultimately totaled some $53,500.00.

All these events point to the inescapable conclusion that Huckaby, who unquestionably had possession of the funds in question took the steps he did in order to avoid honoring the IRS levies and to divert as much as possible of those monies to Hunt's own use. He had no valid reason for failing to honor the levies, and by failing to comply with them, Huckaby bears personal liability under Internal Revenue Code § 6332(d)(1).

The government is further entitled to a 50 percent penalty under § 6332(d)(2), since Huckaby lacked reasonable cause in failing to honor the liens. Establishing the requisite reasonable cause is even more difficult than establishing a defense for not honoring the lien in the first place, since such good causes exists only where there is a bona fide dispute over: 1) "the amount of property to be surrendered pursuant to a levy"; or 2) "the legal effectiveness of the levy." 26 C.F.R. §301.6332-1(b)(2). Here, no dispute as to the amount of the levy has even been raised, and as stated above any argument that the levy was ineffective given Hunt's bankruptcy filing lacks merit. In addition, Huckaby cannot claim that he was not notified as to exactly what funds the IRS sought to collect, since he simply responded to the levies by stating he had "no funds"

///
///

even though the funds in fact were in a bank account he held as trustee of the Texas Tea Trust.[6]

Summary judgment in the government's favor and against Huckaby is therefore granted as to the First and Second Claims for Relief, which seek damages in the amount of Action's unpaid $35,719.36 in tax liabilities[7] as well as a 50 percent statutory penalty of $17,859.68, given Huckaby's lack of reasonable care in failing to honor levies that would have generated funds to pay Action's remaining tax obligations to the IRS.

### B.    Fraudulent Transfers

California's version of the Uniform Fraudulent Transfer Act, as codified at Civil Code § 3439.04, defines a fraudulent transfer in pertinent part as follows:

> "(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:
> (1) With actual intent to hinder, delay, or defraud any creditor of the debtor;
> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation . . . "

The government contends that the above described transfers were fraudulent under this definition, since they were done to prevent the IRS from collecting on its levies. Given Huckaby's repeated and uequivocal efforts to move the funds so as to avoid paying the IRS, the Court agrees that the transfers were both fraudulent and made with actual intent by Huckaby to hinder IRS' efforts to collect Action's unpaid taxes. Additionally, as the government also points out, the transfer from Huckaby's trust account to the Texas Tea Trust were also constructively fraudulent since they were not used for Action's benefit. This is because Action, a company already insolvent, received

---

[6] Huckaby candidly admitted at deposition that he put the funds into a trust under his control that was not in the name of either Hunt or Action in order to "take care of" the IRS levies. Huckaby Dep., Exh. "G" to the Decl. of Nithya Senra, 62: 9-12, ECF No. 30-4.

[7] In addition to $3,528.95 that Huckaby paid out of the Gregg Trust towards Hunt's personal liability for amounts Action owed the IRS, the IRS also received another $40,877.08 from the bankruptcy trustee, which reduced the Action's remaining tax liability down to the $35,719.36 figure. The $35.719.36 outstanding balance of Action's tax liabilities is set forth in the Decl. of Patrick J. Brown and its attachments, ECF No. 30-3.

no reasonably equivalent value in exchange for the funds.  Finally, Richard Gregg's UCC-1 lien was ineffective to encumber Action's assets (specifically, the $83,069.61 Minden lawsuit settlement check) since Hunt had no equity in those assets and because Action was insolvent at the time the UCC-1 lien was recorded in any event (and also received no consideration for transferring the funds to Gregg).

The Court cannot, however, make the same conclusion as a matter of law with respect to Hunt's role in what occurred.  According to his deposition testimony, Hunt simply gave the check from Action to his attorney, Huckaby, without any specific instruction as to what to do with it.  Hunt Dep., 27: 19-21, Ex. "E" to the Senra Decl., ECF No. 30-4.  While his testimony is less than clear, Hunt appears to contend he told Huckaby to pay off the IRS so that he "could be a clear man".  Id. at 34:21-35:15.  Triable issues of fact remain as to Hunt's role in what transpired, and, while Huckaby's liability for having fraudulently transferred the money is clear, those factual questions as to Hunt preclude granting summary judgment against him for the Third Claim for Relief.

### C. Conversion

The common law tort of conversion has long been defined as the wrongful exercise of dominion over the personal property of another.  Welco Electronics, Inc. v. Mora, 223 Cal. App. 4th 202, 208 (2014); Steele v. Marsicano, 102 Cal. 666, 669 (1894).  The elements of the cause of action are: 1) the plaintiff's ownership or right to possession of the property at the time of the conversion; 2) defendant's conversion by a wrongful act or disposition of the plaintiff's property rights; and 3) damages.  Los Angeles Federal Credit Union v. Madatyan, 209 Cal. App. 4th 1383, 1387 (2012); Baldwin v. Marina City Properties, Inc., 79 Cal. App. 3d 393, 410 (1978).  Unlike fraudulent transfer, however, the tort of conversion does not require actual intent under California law.  Instead, "[t]he foundation of the action rests neither in the knowledge nor the intent of the defendant . . . .  Therefore, questions of the defendant's good faith, lack of knowledge, and motive are ordinarily immaterial" since it is "the action of conversion itself [that] is

///

tortious." Welco Electronics, 223 Cal. App. 4th at 208-09 (citing Los Angeles Federal Credit Union, 209 Cal. App. 4th at 1387)

By virtue of its levies, the government contends it had a clear right to the $83,069.61 check in question. Despite that right, according to the government Hunt wrongfully disposed of the funds first by transferring the entire check amount to Huckaby and later by receiving the benefit of some $61,000 in funds through the New Horizons Trust for his own use and personal benefit as opposed to the monies being utilized to satisfy Action's obligations. Additionally, since the IRS has remained unable to collect some $35,719.36 in Action's federal tax liabilities, it has established damage as a result of Hunt's actions. Consequently, irrespective of Hunt's intent or his knowledge of what Huckaby intended to do with the settlement proceeds, it cannot be disputed that his actions resulted in a conversion as to the government's interest in the Minden settlement funds.

The government similarly contends Huckaby converted the funds when he placed them first into a client trust account, and then into the Texas Tea Trust, the Richard P. Gregg Trust and the New Horizons Trust. For the same reasons outlined about with respect to subverting the IRS' valid levies on the fund and with regard to fraudulent transfer, Huckaby's actions also constitute conversion as a matter of law.

## CONCLUSION

For the reasons stated above, the United States' Motion for Summary Judgment (ECF No. 30) is DENIED as to Defendant Hunt's liability as to the Third Claim for Relief, but otherwise GRANTED in its entirety. The government is therefore entitled to judgment at the conclusion of this matter as follows:

///

///

11

///

1. Against Defendant Huckaby in the amount of $35,719.36, plus statutory interest and other additions running from June 15, 2015, for Huckaby's failure to honor an IRS levy pursuant to 26 U.S.C. § 6332(d)(1) as alleged in the First Claim for Relief;

2. Against Defendant Huckaby in the additional amount of $17,859.68, including statutory interest and other additions running from June 15, 2015, for failure to honor said levy without reasonable cause pursuant to 26 U.S.C. § 6332(d)(2) as alleged in the Second Claim for Relief;

3. Against Defendant Huckaby for fraudulently transferring assets belonging to Defendant Action pursuant to California Civil Code § 3439.04 as alleged in the Third Claim for Relief; and

4. Against Defendant Huckaby and Defendant Hunt for tortious conversion of assets belonging to Defendant Action as alleged in the Fourth Claim for Relief.

IT IS SO ORDERED.

Dated: March 30, 2016

_____
MORRISON C. ENGLAND, JR, CHIEF JUDGE
UNITED STATES DISTRICT COURT